Hennen v. Metropolitan Life Insurance is our final case of the day. Ms. Sherman. May it please the court. My name is Martina Sherman and I represent the plaintiff appellant Susan Hennen. This court should reverse the decision of the district court upholding MetLife's termination of Ms. Hennen's disability benefits. The issues in this case are straightforward. MetLife attempted to rewrite the policy in the middle of the claim to avoid liability and then when MetLife's consultants suggested that an independent medical examination was needed, MetLife slammed the door issuing a to make a claim and comply with a requirement that is not in the plan. The plan limits disability benefits for quote-unquote neuromusculoskeletal disorders but it contains an exception for radiculopathy which is a defined term that says a disease of the peripheral nerve roots supported by objective clinical findings of nerve root pathology. Susan Hennen complied with that requirement. She provided MetLife with objective clinical findings of radiculopathy. Her pain doctor, Dr. Bhuvanendran, repeatedly documented diminished strength and sensation in her left leg despite having undergone surgery. A neurologist, Dr. Joseph Kipta, performed an EMG that showed changes consistent with radiculopathy and in clinical exam he noted diminished sensation in her left leg. That EMG was supervised by Rabia Malik, a neurologist at Rush University Medical Center, who agreed with Dr. Kipta's findings that the EMG showed radiculopathy. And finally, MetLife's own medical director, Dr. Adewumne, reviewed Hennen's medical records and agreed that they supported a current ongoing diagnosis of lumbar radiculopathy. That should have ended the inquiry but MetLife moved the goalpost. It hired Neil McPhee, a physician from Arizona, to say that all four of those doctors were wrong, that the EMG was really negative for quote-unquote active radiculopathy, which is a term that appears nowhere in the policy and has questionable scientific validity. Now, Ms. Sherman, is there any evidence in the record that in, as you put it, moving the goalposts, having another physician submit an opinion, that MetLife was deviating from its normal course of proceeding in cases such as this? Is there any evidence in this record that would indicate that? MetLife did not provide us with its claims procedures, so I wouldn't know what their exact protocols were with respect to when it's appropriate to that the medical director reviewed the medical evidence and determined that it supported an ongoing diagnosis of lumbar radiculopathy. And MetLife's internal claims personnel determined, and I don't have the exact record site but I can provide it to you, that they needed a file review to determine Hennen's functionality and that Dr. McPhee's sole purpose in reviewing the file was to determine what she could and couldn't do, what her functional limitations were, not to examine whether she suffered from radiculopathy. Did anyone else speak to that issue, the functionality issue? Any of the other experts? Not at the appeal stage, no, other than Hennen's doctors. There was some discussion of functionality by Dr. Peters, who examined the medical evidence in the appeals proceedings, but no, not at the appeal stage. The issue in the appeal, in the denial letter in the appeal, was whether Hennen satisfied this policy exception to the exclusion. And so... This extra doctor was called when? Dr. McPhee was called in July of 2015, so after the appeal proceedings had been initiated. And your Honor raises a great point, which is that Dr. McPhee's sole inquiry was supposed to be what Hennen could and couldn't do, not whether she suffered from radiculopathy. And it was a gratuitous suggestion by him that she, in fact, didn't suffer from radiculopathy. He came up with this distinction of active versus inactive radiculopathy, which none of the four doctors who had reviewed this exam had made a notation of or considered relevant. Would you consider that to be really, though, an antecedent question to the functionality question he was asked? In other words, would a person in the medical profession have to answer the question of whether or not she suffered from radiculopathy before getting to the functionality question? I think it's certainly part of the inquiry in what a person's functional limitations are. I think it's debatable how valid a person can make functional restrictions and limitations based on a lack of an in-person examination. Is there a piece of paper in the record of exactly what Mett asked this physician to investigate? That they were particularly interested in functionality? Yes, Your Honor. I can retrieve that record site if you would like. Oh, we'll find it. It's the last couple of pages of his initial report, isn't it? That's correct. It includes the questions posed and his answers? Yes. And so my opponent would have you believe that Dr. McPhee's opinion on this matter, on the activity or lack thereof on the EMG, is determinative in this case. That he's an authority on this matter. But the reality is that his opinion is contrary to two neurologists. The neurologist who administered the EMG, who was board certified at the time that he administered the EMG, and also to the professor of neurology who supervised the exam, and both reviewed the EMG findings and determined that they showed ongoing radiculopathy. Ms. Sherman, can I ask you about, maybe a fairly basic question, but as I understand this, if a nerve has been, a spinal nerve root, has been subjected to compression over a period of time, even after that compression has been relieved, there will be often continuing pain, weakness, and limited sensation. Is that right? Yes, that's correct. What I'm getting at is my concern about the difference that Dr. McPhee focused on between active and, I guess, past radiculopathy. That the, that past nerve compression, at least, can cause current symptoms. Is that right? Yes, Your Honor. That's what the other doctors were identifying? Your Honor, it's that there is an MRI in the record that shows that there was no active compression at the time that the EMG was administered, but the active nerve compression is not the only source of radiculopathy. My client had an annular tear. Right, there are other, there are other sources, but there also are residual effects from past compression, correct? Correct, Your Honor, and that's what the EMG documented, and those findings can occur, you know, regardless of whether the herniated disc has been surgically repaired. Even if this court disagrees with our criticisms of Dr. McPhee's report, it must contend with the fact that Dr. McPhee himself said that he had inaccurate or inconclusive information that an independent medical examination was needed, and MetLife never followed up on that recommendation. Instead, it issued a denial letter the following day. This court considered a similar activity or similar behavior in Holmstrom, where the MetLife's examining or non-examining doctor similarly recommended an independent medical exam, and none was ordered, and it considered that an abusive discretion. A fiduciary has a duty to get to the truth of the that might prove a claim to be valid, and that did not occur here. Your argument is that having gone an extra step for themselves, they should have gone an extra step for your client. My argument, Your Honor, is that there was a open question in the record from MetLife's own doctor, who was the only doctor opposing the claimants, this diagnosis of radiculopathy, and MetLife ignored that and arrived at a self-serving result. If there are no further questions, Your Honor, I'll reserve my time for rebuttal. Certainly, Ms. Sherman. Mr. von Schleicher. Good morning. My name is Warren von Schleicher. I represent the This case presents fundamentally a medical question. It's a dispute about the medical interpretation of diagnostic tests for radiculopathy. Ms. Hennen underwent surgery to relieve a herniated disc in 2012. Her surgeon, Dr. Phillips, visually inspected the lumbar nerve during the surgery and documented in his operative report that the nerve was mobile, free, and indicated no sign of damage. MRIs in December 2012, February 2014, September 2014 showed no damage of the peripheral nerve root. So was Dr. Phillips saying there had been no nerve compression or that he relieved it surgically? The record suggests that there was nerve compression. When Dr. Phillips relieved, when he performed the disc surgery, he then inspected the nerve. So he did not visually see, but the diagnosis had been made of a herniated disc, and as Dr. McPhee noted in his report, he presumes there was some kind of a compression, which would have been... That's why you do the surgery. Correct. Yes. But it's not necessarily nerve compression when one does the surgery, but yes, I think presumably it would be indicated here. So the subsequent MRIs, 2012 through 2014, showed no nerve damage, no damage to the disc. Judge Ripple's question regarding Dr. Attawunmi. Dr. Attawunmi accepted the EMG conclusion of polyradiculopathies at face value, but Dr. Attawunmi's report was not a report one could call favorable to Ms. Hennon. Dr. Attawunmi went on to identify functional capacities that one would say are compatible with sedentary work. Right. The problem here, though, is that the case comes to us not with the issue of her functional capacity before us, but only on the issue of the radiculopathy evidence exception to the exception, right? That's correct. And on that point, he says it's his medical opinion that the information supports a Yes. And Dr. McPhee, who has expertise in electromyography, provided quite an extensive analysis as to why there was no active radiculopathy. There was... Right. But could you address Dr. McPhee's statements that additional clinical examination, if needed, to further assess the issue of possible radiculopathy? That doesn't sound like he's foreclosing that issue. Yes. Dr. McPhee determined it multiple in both of his reports that the normal insertional activity and the absence of spontaneous activity in all eight muscles tested and thus in all nerve roots demonstrated were normal findings and demonstrated that there was no active radiculopathy. He opined, based on his expertise, that the motor unit action potential durations in eight muscles could potentially show a past radiculopathy, but that a past radiculopathy was unlikely because the findings of the durational findings were so diffuse in all eight muscles, which is And there was no testing on the contralateral leg. The other leg. Excuse me? The other leg? Yes, exactly. The other leg. Sorry, sometimes we... Reading these, you picked up the lingo. We have not. Sometimes we submerge too deeply. So in the other leg, the right leg. Right. So Dr. McPhee's point with regard to the motor unit action potentials was that it could potentially and at most show a past radiculopathy, but he thought it was unlikely given the diffuse nature of the findings and the absence of testing. Why is a past radiculopathy not sufficient to satisfy the exception? That is... It's not a term that's used, active radiculopathy is not used in the policy. It's quite frequently used in medicine and in court decisions, but it's important because past radiculopathy no longer has nerve damage. There is no longer damage to the nerve root. Now one still might, as a result of a past radiculopathy, one might, or as a result of laminectomy or any other things, experience radicular pain, which is described as radiculitis, but a past radiculopathy is the absence of the disease or damage to the nerve root itself. What's the purpose of the objective evidence requirement for the soft tissue disabilities? This is a very broad limitation in this plan and this really comes down to employer choice. NCR is a very large employer. It comes down to having objective clinical evidence, right, as opposed to purely self-reported symptoms. That's correct, and in this instance with radiculopathy, one is looking at damage to the nerve root. But if you have had past compression and damage, that's an objective indicator that can lead to symptoms today. I wouldn't agree with that and I don't think Dr. McPhee's does that. No, McPhee's does not, but everybody else does. Yes, but Dr. McPhee is a highly qualified electromyographer. And wants more studies of this patient. With regard to the meaning of the motor unit action potential duration and whether or not there was evidence of a past radiculopathy. Not whether there was an active ongoing radiculopathy. And in this instance under the plan disability must be continuing and the disability must have objective evidence of radiculopathy. Radiculopathy several years ago without an active ongoing radiculopathy, without a damage of the nerve root, doesn't fall within the exclusion to the limitation. Would it be radiculopathy, would it count under the policy if nerve compression from a ruptured disc that provoked surgery was successfully taken care of surgically, a month later the patient still has pain, diminished sensations, diminished strength. Would that count under the policy? There could still be active radiculopathy when the compression is removed because there could still be damage to the nerve root. That would be picked up on electromyographic testing because one could then determine that there was abnormal insertional or spontaneous activity in the nerve root. When that ceases, however, and hopefully for the patients it does cease, sometimes it doesn't, many times it regenerates, it does. The removing of a compression doesn't necessarily cure the radiculopathy because fundamentally one must determine whether there's still damage to the nerve root and that damage could continue. But it would need to be picked up objectively and in this instance, as Dr. McPhee's report extensively discussed, the normal insertional activity and absence of spontaneous activity in all eight nerve roots demonstrated that there was no active ongoing radiculopathy. Under the policy, do treating physicians' clinical observations count as objective evidence? I think it can. It depends on what it is. Certainly Dr. Phillips' surgical observation during open surgery in 2012 and actual observation of the health state of the nerve roots of the spine, I think that is an objective clinical finding. How about Dr. Buvanendran's observations of diminished sensation and strength? I think there's problems with that on two grounds. One is to a certain extent it is dependent on subjective reports of pain. On the other hand, if I could just finish this one point, Dr. Buvanendran's findings were inconsistent with radiculopathy because of the variance in the limitation. On the day of the AMG there was 5 out of 5 strength and two months earlier there was 3 out of 5 strength. Pain ranged from 0 to 100%, 0 to 10 out of consistent with an active ongoing radiculopathy. So MetLife maintains that under the arbitrary and capricious standard it reasonably decided a conflict in the medical evidence. By agreeing with Dr. McPhee's assessment and the district court's opinion under the arbitrary and capricious, we maintain it should be upheld. Thank you very much. Thank you. Anything further Ms. Sherman in your remaining 21 seconds? Yes, your honor. Perhaps a sentence or two. MetLife is conflating active radiculopathy on EMG with active radiculopathy in the clinical sense, which means ongoing symptoms. Henin's doctors all agreed that she had ongoing symptoms. Her EMG supports the existence of radiculopathy and with that we would ask that this court reverse the decision of the district court and hope that MetLife's decision to deny Henin's benefits was arbitrary and capricious. Thank you. Thank you counsel. The case is taken under advisement and the court will be in recess.